J-S03030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.H., BIRTH MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1511 WDA 2019 |

Appeal from the Order Entered September 9, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000045-2018

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                 **FILED FEBRUARY 11, 2020**

S.H. ("Mother") appeals from the order entered[1] in the Allegheny County

Court of Common Pleas Orphans' Court, granting the petition of the Allegheny

County Office of Children, Youth and Families ("Agency") to involuntarily

terminate her parental rights to her minor, dependent son, Z.O. ("Child"),

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The order was dated August 8, 2019, and filed September 6, 2019.  However, notice pursuant to Pa.R.C.P. 236(b) was not provided until September 9, 2019.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999).

J-S03030-20

pursuant to Sub-sections 2511(a)(2), (5), (8), and (b) of the Adoption Act.[2]

After review, we affirm.

The Orphans' Court summarized the factual and procedural history as follows:[3]

The Child was born on November 12, 2010. He has eight siblings, all of whom [are] girls. He lived with his Mother and Father until they separated in 2014, after which he continued to live with Mother and the girls. The Child and his siblings were removed from Mother's care on August 11, 2016, and the Child was adjudicated dependent the following month on September 12, 2016. All nine children have been out of the home since the removal.

The removal took place after police and the fire department were called to the family home in response to a fire in the attic. What they discovered was a home in deplorable conditions and unfit for children. Dog feces were strewn about, and animal control came and removed the dog. Clothing and garbage littered the house, which was also infested with fleas. The kitchen sink was clogged, and the back door had a broken knob, leaving the home at risk of intrusion. The children lacked basic necessities for hygienic living, such as toothbrushes, and wore the same clothing for stretches of five days at a time. The children had begun to have problems with truancy. At the hearing on this matter, Mother condemned some of these findings as "lies" and blamed the landlord for the home conditions.[4]

_____

[2] 23 Pa.C.S. §§ 2101-2938. By the same order, the Orphans' Court also involuntarily terminated the parental rights of Child's father, Z.A.O. a/k/a Z.O. (Father), pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

Furthermore, we note counsel for Child has filed a brief with this Court in support of Child's position that his parents' rights not be terminated.

[3] We have omitted the Orphans' Court citations to the hearing transcript.

[4] With respect to Father, the Orphans' Court summarized:

- 2 -

\*　　\*　　\*

Mother's goals included completing parenting classes, undergoing a mental health evaluation and maintaining a clean, safe and stable home as well as attending visits with the Child and participating in domestic violence treatment. On the positive side, Mother did complete an additional goal of getting Social Security Disability Insurance . . . because of her continued need for kidney dialysis three times weekly.[5] Moreover, Mother did find a one-bedroom apartment that is clean and safe in the view of the Agency. She would be eligible for assistance with a two-bedroom apartment if any child were returned to her.

However, during the three years in which [C]hild has been in foster care, Mother never showed substantial compliance with some of her most important goals, and [on February 27,] 2018, the Agency filed for termination of parental rights.

Orphans' Court Op. at 1-3 (paragraph break added). At the time of the termination petition was filed, Child was seven years old, had been removed from Mother's home approximately for more than one year and six months.

Following several continuances, the Orphans' Court conducted a hearing

_____

After removal of the children, Father's goals related primarily to drug and alcohol usage, mental health issues and domestic violence with Mother. . . . The last incident of domestic violence between Father and Mother was in 2016, after which a no-contact order was issued, and the two have not been together since. . . . Father was essentially out of the picture, not having seen Child since approximately May of 2017.

Orphans' Ct. Op., 11/4/19, at 2.

[5] The termination-hearing testimony of Shelby Alston, Agency caseworker, inferred that Mother was living at Genesis House, a program for "women with children who are pregnant." **See** N.T., 8/8/19, at 15-16.

on the Agency's termination petition on August 8, 2019. By this time, Child had been removed from Mother's care for three years, had been placed in at least four different foster homes, and had been living with his current foster parents for approximately one year and seven months. Mother appeared *via* telephone and was represented by counsel. Child was also represented by counsel. The Agency presented the testimony of Agency caseworker Alston; Joshua Rowe, foster care worker and placement coordinator, Project Star; and psychology expert witness Neil Rosenblum, Ph.D. Mother testified on her own behalf.

The Orphans' Court reviewed the evidence presented by the Agency in detail. With respect to Mother's goals to complete domestic violence and mental health treatment, the Court noted:

> Mother did not complete domestic violence treatment. Mother finished a parenting program in June of 2017 and was referred for coached visits; however, she was discharged within three months due to failing to confirm two weeks in a row. Mother remained only partially involved with other family-based services, attending only about half of her visits with the Child. Mother's attendance improved since March of 2019 after the petition to terminate her rights was filed.
>
> * * *
>
> Mother's goal for mental-health evaluation was established because Mother admitted to a history of depression and anxiety with a suicide attempt in 2014, and she had been inconsistent in getting treatment over the years. At an appointment in January of 2017, Mother was diagnosed with Major Depressive Disorder and Adjustment Disorder but was not able to participate with treatment thereafter, in part because she became pregnant and was put on bed rest in the hospital in March of 2017. Mother eventually had a mental-health intake appointment in September

- 4 -

of 2018 but was discharged for failure to appear for appointments. Mother testified that she thinks she is "okay" and that "that's kind of unnecessary," although she claimed she would do it if given the chance again.

After the petition to terminate her rights was filed, Mother restarted mental health treatment, having her first new session on May 2, 2019, and remained more or less compliant at the time of the hearing. While Mother improved her parenting abilities to some degree, this Court was deeply troubled by the fact that she did not demonstrate an understanding of the Child's needs, and her visits were recently decreased and have had to remain supervised because of the Child's extraordinary needs. [Dr.] Rosenblum evaluated the Child and diagnosed him with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Reactive Attachment Disorder, Unspecified Trauma and Stressor-Related Disorder and Posttraumatic Stress Disorder. On this point, the Court agrees with the Agency that Mother would not be capable of caring for this Child even if Mother had only this Child to deal with without the attention required by his siblings because of this Child's unusual needs and his serious aggression level. This Child is difficult to parent and has been through four foster homes and has been psychiatrically hospitalized since his removal. He has been in respite care, too, to give the current and devoted foster parents a break.

\* \* \*

Mother was supposed to have her own more recent, updated [mental health] evaluation but missed the appointment because she said it slipped her mind. However, [Dr. Rosenblum] evaluated her multiple times in the past and was able to discuss Mother's emotional well-being. [Dr. Rosenblum] found that Mother had many difficulties in her own childhood. Additionally, Father left her with nine children, and she was overwhelmed in trying to maintain housing and care for that many children, and the children began to struggle. Mother's mental health issues get in the way of her parenting as well. While Mother may have good intentions, Dr. Rosenblum noted that "she certainly would not at all have the capacity to manage or provide appropriate care . . . ." The visit supervisor testified that Mother could benefit from coached parenting, but it would be a very long road for her in this case.

Orphans' Ct. Op. at 3-4, 5 (citations to record omitted).

The Orphans' Court also addressed Child's mental health and behavioral concerns:

> Dr. Rosenblum testified that the Child is "very challenging" with "well-defined and documented mental health concerns of a very serious nature." He noted that the Child had undergone multiple hospitalizations in the past for his aggressive and self-harming behaviors. The Child is on several medications and has participated in various therapeutic programs. He can be very impulsive, and his aggressive behaviors can escalate quickly when he does not get his way. This Child, he opined, would require consistent discipline and very skilled intervention.

Orphans' Ct. Op. at 5 (citations to record omitted).

The Orphans' Court then considered Mother's post-petition visits with Child, as well as her comprehension of Child's mental health and behavior issues:

> Initially, Mother's visits were to occur with all the children, but this was changed to visiting with three at a time. The visit with all of the children in the fall of 2017, prior to the change, was particularly hard on the Child, who had to leave early because he became upset. The visits that did occur often negatively impacted the Child. He also exhibited distress when Mother was supposed to visit but did not. After visits, the Child's conduct ranged from disobedient and verbally aggressive to physically aggressive. In fact, he once tried to turn the transport vehicle around by climbing out of the seat belt and over the seats. He has thrown rocks at cars and tried to break into the neighboring homes. The Child is easily triggered to these behaviors by numerous types of events and has had conflicts with his older siblings in visits and has then demonstrated the same types of behaviors afterward. During visits where the Child was alone with Mother, Mother played with the Child as a playmate and was not successful in acting as a parental figure. Mother did not provide much structure, giving only minimal redirection for unacceptable behavior. Overall, the psychologist who testified found that the visits with Mother and the siblings "are more detrimental than beneficial."

\* \* \*

Mother is aware of the Child's difficulties but minimizes them in the extreme. Mother instead blames the Agency and the Child's removal for the Child's behavioral and psychological issues. Mother testified that the Child only has "little behaviors sometimes" and "nothing big." Mother only acknowledged the Child's prior symptoms of being somewhat hyper. Mother stated she had talked a little bit to someone at Head Start about the [C]hild's hyperactivity but that she hoped he would grow out of it and did not approach any medical professionals. Her primary strategy for dealing with the [C]hild is, she testified, to hug him and show him love and calm him or play with him.

Orphans' Ct. Op. at 3-5 (citations to record omitted).

At the conclusion of the August 8, 2019 hearing, the Orphans' Court terminated both Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[6] As discussed above, the order was properly entered on September 9th. On October 4th, Mother filed a timely, counseled notice of appeal, along with a Pa.R.A.P. 1925(a)(2)(i) statement of errors complained of on appeal.

Mother raises the following issue for our review:

Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

---

[6] While the order did not specifically reference Sub-section 2511(b), the court incorporated its language, stating, "The [c]ourt further finds that terminating the parental rights of Mother serves the needs and welfare of the child." Order-Involuntary Termination of Parental Rights, 9/9/19.

Mother's Brief at 6.

Mother argues Orphans' Court erred in finding termination was in Child's best interests pursuant to Sub-section 2511(b).[7] Mother asserts that services—such as interactive parent-child therapy, coached parenting, and therapeutic visits, which were recognized as desirable by the service providers in this matter—were not afforded to her and Child prior to termination. Mother contends the Agency cannot show termination best serves Child's needs and welfare,

> where [Child] has yet to achieve necessary growth. The opinion that termination will hopefully allow for future growth is only a hope, not a finding, that such will occur.
>
> The only way to allow [Child] to achieve maximum future growth is to restore Mother's parental rights so the [Orphans' C]ourt may order the recommended therapy between Mother and [Child] to occur. That is clearly what best serves the needs and welfare of [Child].

Mother's Brief at 6. No relief is due.

We note:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

---

[7] Mother does not raise any challenge to the Orphans' Court's findings under Sub-section 2511(a).

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result." *Id.* at 73.

The termination of parental rights is governed by Section 2511 of the Adoption Act.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d

- 9 -

1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

As Mother does not challenge the Orphans' Court's grounds for termination under Section 2511(a), we analyze the court's findings pursuant to Section 2511(b) only, which provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*See* 23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However . . . evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267 (citations omitted).

> "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."
>
> [I]n addition to a bond examination, the trial court can

- 10 -

> equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted). Additionally, "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010).

In determining that termination of Mother's parental rights best served Child's needs and welfare under Section 2511(b), the Orphans' Court noted:

> Termination will certainly have an initial negative effect on the Child because he is old enough to know his siblings and his Mother and will therefore have awareness of loss, and the psychologist testified that the Child is attached to his siblings and his parents. However, the Child also spoke favorably about his current foster family and acknowledged that they take good care of him and love him. In fact, as the psychologist confirmed, the Child "actually said that he would be okay with being adopted," although the Child does have ambivalent feelings about all of his relationships, which is consistent with his reactive attachment disorder. Mother herself believes that termination of her rights would negatively affect Child "for a while," but also believes he will be capable of accepting the situation at some point.

Orphans' Ct. Op. at 8 (citations to record omitted).

The Court noted Child had been with his current foster parents for more than a year, since January of 2018. Orphans' Ct. Op. at 9. The caseworker has visited the home about once monthly, and Child "seems comfortable there. Sometimes, he does not listen, but the caseworker has not witnessed aggression." **Id.** The Court considered:

- 11 -

Critical for this particular Child, who has bonding issues in general, is the fact that he has demonstrated emotional connection with his foster family and, in their care, has improved his behavioral control. This Child has difficulty with empathy and is egocentric, but he has developed a good relationship with the dogs in his home and has not set fires, a problem for him in the past. Dr. Rosenblum stated that even the Child "in his own way . . . recognizes that he is in good hands with them," and that to have the Child continue with the distraction of visits with his family will prevent him from attaching to the foster family that gives him the best opportunity to feel secure. *See, e.g., In re T.S.M.*,71 A.3d [at 268-69] (observing that a bond with a parent who is not capable of caring for a child can impede the child's ability to attach to a pre-adoptive family who can provide stability).

Additionally, the Child is beginning to show love for the foster parents. The psychologist testified credibly that the Child has "exception[al] mental health and developmental difficulties and needs that require an exceptional amount of training, care and attention." Fortunately for the Child, the psychologist affirmed that the current foster parents take those extra measures to try to understand and help the Child. The foster mother has been taking training to deal with the Child's aggressive behaviors and has been working with family-based therapy on techniques to ameliorate the problems. The Agency and the psychiatric hospital have been providing training as well. This Child is unusually violent and disruptive and needs structure imposed on him, which the foster parents do provide. The Child went through multiple foster homes during his removal, and this [c]ourt credited the psychologist's testimony that giving the Child permanency with his current foster family will give the Child the "best opportunity for sustained emotional well-being." *See also, e.g., T.S.M.*, 71 A.3d [at 267-69] (reversing denial of mother's termination of parental rights regarding seven children and discussing damaging effects of "foster care drift" and need for permanence even where children showed a significant bond to mother).

*Id.* at 8-9.

Finally, the Court considered Child's wishes:

The Child was able to articulate his position to his legal counsel: the Child does not want his parents' rights terminated,

- 12 -

but at the same time, he also expressed a strong desire to continue living with his foster family and would not want to be cut off from them either. This Court considered the Child's position but is persuaded that it is in his interests to terminate Mother's parental rights and that his needs and welfare will be advanced by freeing him for adoption and the chance to adjust. *See T.S.M.*, 71 A.3d at 267-68 (noting that even abused children typically harbor positive emotions toward the offending parent, but the mere existence of a bond cannot preclude the beneficial protection of a child's stable pre-adoptive family, and the court cannot overlook the harm inflicted on children by prolonged familial uncertainty)[.]

Orphans' Ct. Op. at 10 (citations to record omitted).

The Orphans' Court concluded:

The Child has been out of Mother's care for three years, and Mother has not been able to manage her own issues, much less issues as significant as this Child's. Therefore, as in [*C.J.P.*, 114 A.3d 1046, 1054-55 (Pa. Super. 2015)], this Court determined that "[e]ven if Mother and Child still are bonded, that bond is outweighed in the instant matter by Mother's inability to remedy the causes of Child's placement, and by Child's need for permanence and stability." *Id.*

This Court remains convinced that the Child is bonded with his foster family and that if his bond with his Mother and siblings is broken, the Child is poised to make progress and will not suffer irreparable harm. Thus, the reason for this Court's ruling boils down to the very negative interaction of two factors: first, Mother, while well-meaning, has many difficulties that prevent her from being an effective parent to this Child and lacked the insight necessary to make substantial progress over a three-year span, and second, this Child has extraordinary needs and serious mental health diagnoses and is unusually challenging to care for but has found a foster family with whom he has mutual attachment and which has proven willing and able to try. Therefore, termination of Mother's parental rights is in the Child's best interests.

Orphans' Ct. Op. at 10-11 (some citations omitted).

Upon review, we discern no abuse of discretion. The record supports

- 13 -

the Orphans' Court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Sub-section 2511(b). *See T.S.M.*, 71 A.3d at 267.

Critically, at the time of the hearing, Child had been removed from Mother's care for three years. N.T. at 9, 67, 97. Dr. Rosenblum testified that despite Mother's mother intentions, she did not have the capacity to parent and care for Child, and "[i]n fact, she's not really functioning on a very stable, independent level herself." *Id.* at 94-95, 100-01.

Moreover, Child had been placed in his current foster home for approximately one year and a half, since January 2018. N.T. at 42, 44, 91. While recognizing Child had an attachment to Mother and siblings,[8] Dr. Rosenblum indicated that Child loves his foster parents and is becoming receptive to affection. *Id.* at 94, 96. Dr. Rosenblum reported that Child "said that he would be okay with being adopted as well as [foster parents] do take good care of him."[9] *Id.* at 91. Foster parents were described as "very

---

[8] Project Star foster care worker and placement coordinator, Joshua Rowe, indicated that Child has "a fierce loyalty" to his biological family. N.T. at 51. Likewise, Agency caseworker, Shelby Alston, acknowledged concerns with termination of parental rights and potential negative impact, stating, "[Child]'s eight years old so he knows who his family is. And just to not see them at all or not hear from them at all would most likely affect him negatively." *Id.* at 38. Ms. Alston, however, indicated that foster parents are open to telephone calls and holiday visits. *Id.*

[9] This was confirmed by counsel for Child, who reported:

nurturing," "very patient," and "very calm." *Id.* at 95. Dr. Rosenblum further stated the foster parents "try[ ] to do positive things with" Child and are "[w]orking very carefully with his family-based mental health team." *Id.* at 95-96.

Dr. Rosenblum opined it would be in Child's best interests to remain with foster parents:

> [Child] has been out of . . . his mother's care[,] I believe for approximately three years. He failed in at least three previous foster homes before entering his current placement. He's a child with exceptional mental health and developmental difficulties and needs that require an exceptional amount of training, care and attention.
>
> I'm quite confident that he's fortunate to be in this placement and that his continuation in this placement and the permanency goal of adoption would absolutely give [Child] the best opportunity for sustained emotional well-being. Hopefully[,] future growth. And progress in his mental health functioning, his developments and his ability to relate effectively to others.
>
> I believe with a great deal of confidence that the support and assistance that he is getting in his foster home is the main reason that he is making some progress and is able to avoid hopefully further hospitalizations and even institutionalization. Given his explosiveness[,] I believe unfortunately that he would be at risk to continue to struggle in other placements if he had to be removed from his current placement with his foster parents.

---

[Child] did state that he does not want the parental rights of either of his parents to be terminated and he wishes to maintain a relationship with them. . . . At the same time, he's expressed a strong desire to continue living with the foster family. And similarly[,] said that he would not want to on a piece of paper from the [c]ourt or in any other real-life scenario be cut off from the foster family.

N.T. at 119-20.

- 15 -

*Id.* at 97-98. Dr. Rosenblum additionally expressed that adoption would provide for the permanency and stability Child needs:

> I think adoption will facilitate his best opportunity to secure a healthier attachment. To have a distraction of frequent visits with his mother or sisters eliminated and to give him confirmation that this is his home. This is his family. This is his identity. This is where he belongs. And it is my opinion that this will lead to the best opportunity for this little boy to feel safe and secure with the environment that he's in right now.

*Id.* at 109, 113.

While Mother professes to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, Child had been in placement for three years and is entitled to permanency and stability. As this Court has stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *See id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Accordingly, based on the foregoing analysis by the Orphans' Court, we affirm the order terminating Mother's parental rights.

Order affirmed.

J-S03030-20

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/11/2020